IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>vs.<br><br>Derick Colin Wilkinson,<br><br>            Defendant. | Case No. 1:24-cr-00161 |

**ORDER REJECTING PLEA AGREEMENT AND SETTING NEW DATE FOR TRIAL**

## INTRODUCTION

[¶ 1]  THIS MATTER comes before the Court following a Change of Plea Hearing held on December 3, 2025. Doc. No. 56. At the Hearing, the Court indicated it was uncomfortable with the proposed sentence in the Plea Agreement and requested the United States to brief whether it could seek approval from the Three Affiliated Tribes (also known as the Mandan, Hidatsa, and Arikara Nation) to pursue the death penalty in this case and continued the hearing. Id.; Doc. Nos. 57, 61, pp. 6–7, 9. The United States filed its Brief on December 4, 2025. Doc. No. 59. The Defendant filed a Response on December 15, 2025. Doc. No. 62. The rescheduled Change of Plea Hearing was held on March 2, 2026. (Doc. No. 63). For the reasons set forth below, the Court **REJECTS** the Plea Agreement entered into by the parties. This case will be reset for trial.

## BACKGROUND

[¶ 2]  The following background is based upon the record presently before the Court. On August 9, 2024, at approximately 8:40 am, Officer Dave Kamp with the McLean County Sheriff's Office saw black smoke coming out of the window of 5704 Bloody Knife Street in White Shield, North Dakota, located near the boundaries of the Fort Berthold Indian Reservation. Doc. No. 1-1, p. 3.

Upon closer inspection it was clear that the house was on fire. Id.  Officer Kamp tried to enter the residence through the front door but was unsuccessful. Id. The Defendant came out of the residence from the garage. Id. The Defendant is an enrolled member of the Three Affiliated Tribes and lived in the residence with his girlfriend, the victim, and her two children, Minor Victim 1 and Minor Victim 2. Id. He stated his girlfriend and the two children were still in the home. Id. The Defendant's brother, Cedrick Wilkinson, Jr., was planning to drop his children off at the victim's house when he noticed that the house was on fire. Id. at 5. When he drove up, he saw the fire coming out of the kitchen and went to the garage where he met up with the Defendant and Officer Kamp. Id. Since the fire blocked direct access to the children's bedroom, the Defendant broke a window to the bedroom and the Defendant, his brother, and Officer Kamp successfully got the children out of the home. Id. at 4. Emergency responders performed CPR on at least one of the children and both were taken to Trinity Health in Minot, North Dakota for their injuries and later recovered. Id.

[¶ 3]   Before the Defendant was taken to Bismarck for his injuries, Cedrick Jr. told an officer there had been an argument the night before between the Defendant and the victim. Id. Likewise, McLean County Detective Bradley Nielsen spoke with many neighbors on the scene at the time of the fire who stated that the Defendant and the victim have had arguments in the past, there was possibly domestic abuse in the home, and claimed the Defendant and the victim had a fight the night before the fire. Id. at 4–5. Two next-door neighbors stated that two housing authority workers recently went to the victim's house for an inspection and noticed bruising and red marks on the victim's neck. Id. at 4.

[¶ 4]   Garrison Fire Department responded to the fire at the home and successfully extinguished it. Id. at 5. However, this took time because the house was still burning for a considerable amount

of time due to multiple "hot spots" throughout the structure, which made the home dangerous to enter. Id. As a result, first responders looked through the windows to see if they could locate the victim. Id. 5–6. They were unable to locate her at that time, but did notice her phone on a table next to the bed in the basement and a pillow with a dark reddish-brown stain on it. Id. at 6.

[¶ 5]    After the fire was extinguished, a body was found face down on a mattress in one of the upstairs bedrooms. Id. at 6. Stains of a reddish-brown color were observed on the walls of the bedroom in the basement reported to be shared by the victim and the Defendant. Id. The medical examiner who conducted the autopsy concluded the victim died due to the combined effects of strangulation and burning by fire and was likely alive briefly after the start of the fire but was comatose. Doc. No. 33, pp. 4–5.

[¶ 6]    On August 13, 2024, Minor Victim 1 and Minor Victim 2 were forensically interviewed. Doc. No. 1-1, p. 7. Both Minor Victims stated the Defendant fought with the victim and hurt her the night before the fire. Id. Minor Victim 2 stated the victim had blood on her from that fight and the minor saw the Defendant "choking" the victim. Id.

[¶ 7]    On August 24, 2024, law enforcement acquired access to video from a camera recording inside the house on August 8, 2024, the night before the fire. Id. In the videos, the Defendant becomes agitated with the victim and then assaults her with his hands, his feet, multiple chairs, a table, and a bookshelf. Id. at 8. The Defendant wraps his hands and arms around the victim's neck and drags her across the floor by her hair. Id. Special Agent Derek Hill for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) conducted the fire origin investigation in this case and concluded the fire was intentionally set and originated in the upstairs middle bedroom where first responders found the victim's body. Doc. No. 33, p. 2. FBI Special Agent Randy Larkin performed

a historical cell site analysis and found the cellphone number associated with the Defendant was consistent with area of the home around the time the fire was started. Doc. No. 47, p. 2.

[¶ 8]   On September 18, 2024, the Defendant was charged in a Federal Indictment accusing him of: (1) Second-Degree Murder in Indian Country, (2) Arson in Indian Country, (3) Assault with a Dangerous Weapon in Indian Country (with a wooden chair and bookshelf), (4) Assault with a Dangerous Weapon in Indian Country (with a knife), (5) Assault Resulting in Serious Bodily Injury in Indian Country, (6) Assault by Strangulation of an Intimate Partner or Dating Partner in Indian Country, (7) Tampering with Evidence, and (8) Use of Fire to Commit a Felony. Doc. No. 18. The second-degree murder and arson charges carry a maximum of life in prison and a minimum of imprisonment for any term of years. 18 U.S.C. §§ 81, 1111. The assault, strangulation, and use of fire to commit a felony charges carry a maximum of ten years of imprisonment. 18 U.S.C. §§ 113(a)(3),(6),(8), 844(h)(1). On October 29, 2025, a Plea Agreement was filed in the matter providing the Defendant will voluntarily plead guilty to Counts One and Two of a Federal Information accusing him of: (1) Assault with Intent to Commit Murder and (2) Tampering with Evidence. Doc. No. 52, p. 2. Counts One and Two carry **maximum penalties of twenty years each** and the parties intend to jointly recommend a forty-year sentence of imprisonment. Id. at 3, 7. The Information was filed the next day. Doc. No. 54.

## DISCUSSION

### I.   Legal Standard: District Court's Discretion to Reject the Plea Agreement

[¶ 9]   Federal Rule of Criminal Procedure 11(c)(1)(C) provides that

> [a]n attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement . . . specify[ing] that an attorney for the government will . . . agree that a specific sentence or sentencing range is the appropriate disposition of the case.

For plea agreements that meet the specifications of Rule 11(c)(1)(C), "[t]he court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Fed. R. Crim. P. 11(c)(3)(A). A Rule 11(c)(1)(C) plea agreement is binding on the court only if the court accepts it. United States v. Scurlark, 560 F.3d 839, 842 (8th Cir. 2009). "An implicit condition of every plea agreement is acceptance by the trial court." United States v. McGovern, 822 F.2d 739, 743 (8th Cir. 1987).

[¶ 10] The Supreme Court and the Eighth Circuit have consistently affirmed a district court's discretion to reject plea agreements, including in instances when it believes the agreed upon sentence is inadequate in light of the serious nature of the crimes involved. See, e.g., Santobello v. New York, 404 U.S. at 257, 262 (1971) (holding that under Rule 11, a court may reject a plea "in the exercise of its sound judicial discretion."); United States v. Kling, 516 F.3d 702, 704 (8th Cir. 2008) ("Courts are not obligated to accept plea agreements and have discretion to reject those which are deemed . . . unfair."); McGovern, 822 F.2d at 745 n.6 ("It is well within a trial court's discretion to reject a plea agreement if it believes the sentence to be inadequate based on the serious nature of the crime."). The Supreme Court, in particular, has held that while "Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate," their agreement "does not discharge the district court's independent obligation to exercise its discretion," an obligation that includes examining the sentence's sufficiency in light of 18 U.S.C. § 3553(a). See Freeman v. United States, 564 U.S. 522, 529 (2011).

II.     **The Sentencing Limitation Contemplated in the Plea Agreement is Inadequate**

[¶ 11] The Court begins its assessment of the Plea Agreement by noting that indigenous women and girls experience the highest rates of domestic violence and abuse in the United States. According to the National Institute for Justice, more than 84% of American indigenous women

have experienced violence in their lifetimes, with 56% experiencing sexual violence, 55.5% experiencing physical violence by an intimate partner, and 66.4% experiencing psychological aggression by an intimate partner. ANDRÉ B. ROSAY, NAT'L INST. JUST., NCJ 249736, VIOLENCE AGAINST AMERICAN INDIAN AND ALASKA NATIVE WOMEN AND MEN: 2010 FINDINGS FROM THE NATIONAL INTIMATE PARTNER AND SEXUAL VIOLENCE SURVEY 2 (2016). Of those indigenous women who have experienced physical violence by intimate partners in their lifetime, 52.2% report having been slapped, pushed, or shoved by intimate partners and 42.4% report experiencing severe physical violence by intimate partners. Id. at 23. The Centers for Disease Control and Prevention similarly found that homicide is a leading cause of death for indigenous women and girls, who are murdered at a rate **ten times** the national average. See Emiko Petrosky et al., *Homicides of American Indians/Alaska Natives — National Violent Death Reporting System, United States, 2003–2018*, MMWR SURVEILLANCE SUMMARIES (CDC, D.C.) Nov. 19, 2021, at 1–19.

[¶ 12]   The Defendant's conduct towards the victim is emblematic of this epidemic of violence against native women. The sentence the Defendant is facing in this case should reflect these tragic realities and further efforts to end this epidemic of violence against native women and children. The videos captured on August 8, 2024 are brutal and horrifying. See Doc. No. 13, Videos 1–2. In the first video, the Defendant, clearly agitated, shoves the victim onto the couch, locks his arms tightly around her neck, bites her multiple times while she struggles to get free, and slaps her very aggressively. Doc. No. 13, Video 1, at 00:03–00:40. Then, the Defendant grabs her hair, throws her on the floor, and chokes her again with his hands while kneeling on top of her for over forty seconds. Id. at 00:52–01:30. Over the next two minutes, the Defendant kicks the victim, throws chairs at her, and eventually grabs the bookshelf in the room and throws it at her as well. Id. at

01:31–03:32. At this point, blood is spattered across the victim and the floor. Id. The Defendant then grabs the victim and chokes her a third time. Id. at 03:56–04:15.

[¶ 13]   The second video is worse, continuing where the first ended. Doc. No. 13, Video 2. The Defendant chokes the victim nearly a minute and kicks and stomps on her stomach for another minute. Id. at 00:14–02:18. Blood is everywhere now. Id. The Defendant chokes her a **fourth time**, wrapping his arms and his legs around her, while the victim struggles to breathe. Id. at 02:20–02:45. The Defendant then pushes her to the floor, where she appears to be very debilitated, and spits and hits her repeatedly before the video ends. Id. at 2:53–3:42. Throughout the whole encounter, the Defendant screams at the victim and calls her a "bitch," while she also screams in pain as she is being attacked. Doc. No. 13, Video 1, 00:05–4:15; Video 2, 00:07–3:40.

[¶ 14]   Bruising is clearly visible on the victim's neck and legs, id. at 03:14–03:42, suggesting this was not an isolated incident and lends credibility to the statements provided by neighbors that there was a history of domestic abuse in the home and the Minor's Victims' claims that the Defendant was beating and choking their mother the night before the fire. Doc. No. 1-1, p. 7.

[¶ 15]   The Defendant's conduct on the night before the fire shows an utter disregard for the value of the victim's life and nearly relentless cruelty. Even worse, her children were in the home and witnessed the cruelty their mother was forced to endure. Id. While the Court understands the reasons why the death penalty does not apply to the Defendant's alleged conduct, the charges in the Information simply do not reflect the gravity of the Defendant's conduct known to the Court at this time.

[¶ 16]   The Defendant has been accused of brutally assaulting and murdering his girlfriend and burning her house down to destroy all the evidence. Doc. No. 18. Both of her children nearly died in the fire, with at least one requiring CPR to save his life. Doc. No. 1-1, p. 4. Reducing those

actions to simple "Assault with Intent to Commit Murder" and "Tampering with Evidence" and allowing the Defendant to plead guilty to those lesser charges would be a great injustice to the victim, her children, her friends and family, and her entire tribe. If the United States has additional evidence in its possession that casts doubt on the strength of its case justifying the proposed Plea Agreement, that evidence should have been filed with the Court to inform its decision. Based upon the record actually before the Court, the Court concludes the Plea Agreement is inadequate based on the serious nature of the conduct involved. McGovern, 822 F.2d at 745 n.6. The Court will not allow the United States to whitewash these crimes to avoid a difficult trial on the merits. Doc. No. 52, p. 7.

[¶ 17]   Also relevant to the Court's consideration of the Plea Agreement is this is not the first time the Defendant has been implicated in violent actions towards others. In 2016, the Defendant was found guilty of (1) Assault Resulting in Serious Bodily Injury and (2) Assault with a Dangerous Weapon. Jury Verdict, USA v. Wilkinson, Case No. 1:16-cr-00123 (D.N.D. Dec. 14, 2016), Doc. No. 55. Moreover, the victim reported frequent assaults by the Defendant during her relationship with him from 2020-2023. Doc. No. 43, p. 2. These assaults included conduct strikingly similar to the conduct in this case, including being punched with a closed fist, having objects thrown at her (including chairs), being struck with cords, and numerous instances of strangulation in which she "blacked out." Id. She also reported sustaining bruises to her arms, neck, and eyes in addition to broken ribs and a dislocated jaw. Id. On one occasion, the Defendant told the victim that he thought she was dead due to him knocking her unconscious during the assault and said that he thought he was going to have to hide her body. Id.  The victim also indicated that she would be threatened by the Defendant if she did not accept his apologies for the assaults, including threats that the only way she could leave their relationship would be in a body bag and with no teeth. Id. at 2–3.

[¶ 18]  The Court appreciates the parties' concern for the victim's children and recognizes they entered into the Plea Agreement in part to prevent the Minor Victims from having to testify at trial, which certainly could be psychologically challenging. Doc. No. 59, p. 2. However, the crimes alleged and the Defendant's recorded conduct are simply too serious to accept the Plea Agreement as written. In addition, the Plea Agreement would constrain the Court's ability to fully consider an appropriate sentence because each new charge carries a maximum of twenty years imprisonment. Because this case involves very serious crimes and conduct in Indian Country, the Court cannot accept this limitation. McGovern, 822 F.2d at 745 n.6.

[¶ 19]  Finally, even if the death penalty is unavailable because the Three Affiliated Tribes has not opted to allow it (See 18 U.S.C. § 3598), the Court believes the United States should have consulted with the tribe regarding the crimes and pursuit of justice for one of its members and her family. As the Supreme Court has recognized repeatedly, the United States has a trust and treaty relationship with the tribes. See United States v. Jicarilla Apache Nation, 564 U.S. 162, 176 (2011) (noting "the undisputed existence of a general trust relationship between the United States and the Indian people" (quoting United States v. Mitchell, 463 U.S. 206, 225 (1983))); Seminole Nation v. United States, 316 U.S. 286, 296 (1942) (noting the "distinctive obligation of trust incumbent upon the [United States] Government" in its dealings with tribes); Mitchell, 463 U.S. at 225–226, (collecting cases). Pursuant to this relationship, the United States has "charged itself with moral obligations of the highest responsibility and trust," including to act in the best interest of citizens of the tribes, especially when it comes to their safety and welfare. Jicarilla Apache Nation, 564 U.S. at 176 (quoting Seminole Nation, 316 U.S. at 296).

[¶ 20]  The brutal crimes in this case bring immense grief to the tribe. For crimes of this magnitude, this moral obligation "to the fulfillment of which the national honor has been committed" demands

greater communication and cooperation between the U.S. Attorney's Office and the leadership of the Three Affiliated Tribes. Heckman v. United States, 224 U.S. 413, 437 (1912). This communication and cooperation should include giving tribal authorities the opportunity to have a voice in the charges brought against a member of the tribe for crimes against other members. Perhaps greater involvement and awareness of the repeated episodes of violence against women and children in Indian Country may persuade governing members in the tribe to consider adopting the death penalty for future murder offenses. No matter its decision on that issue, the Court respects and appreciates the Three Affiliated Tribes' contributions to our nation. The Court insists the Tribes should be consulted and fully informed as to the awful crimes committed in its territory so tribal authorities can assist the United States in tackling crimes including those against indigenous women and children and seek justice for its members.

## **CONCLUSION**

[¶ 21]  The Court has reviewed the entire record, the relevant caselaw, and the arguments of the parties and finds that the twenty-year sentence maximum in the Information is inadequate based on the serious nature of the crimes committed. Accordingly, the Court **REJECTS** the Plea Agreement (Doc. No. 52) entered into by the parties. See Fed. R. Crim. P. 11(c)(3)(A); McGovern, 822 F.2d at 745 n.6 (8th Cir. 1987) ("It is well within a trial court's discretion to reject a plea agreement if it believes the sentence to be inadequate based on the serious nature of the crime.").

[¶ 22]  Because the Court rejects the Plea Agreement, a new trial date must be set for this case. The Indictment was filed on September 18, 2024. Doc. No. 18. The Defendant filed a Motion to Continue Trial on October 7, 2024 (Doc. No. 27), which the Court granted the next day. Doc. No. 29. The Defendant subsequently filed three Motions to Continue which the Court granted on interest of justice grounds. Doc. Nos. 34, 36, 39–40, 48, 50. All time that elapsed from the ends of

justice continuances and the Court's consideration of the Plea Agreement until trial shall be excluded from any Speedy Trial Act calculation. See 18 U.S.C. §§ 3161(h)(1)(G); 3161(h)(7). Accordingly, twenty days have elapsed under the Speedy Trial Act and fifty remain before trial must occur. See 18 U.S.C. § 3161(c)(1). Accordingly, trial shall be rescheduled for Tuesday, April 7, 2026, at 9:30 a.m. in Bismarck Courtroom 1 before the undersigned. A three (3) day trial is anticipated.

[¶ 23]  **IT IS SO ORDERED.**

DATED March 3, 2026.

Daniel M. Traynor, District Judge
United States District Court